IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELVIN TURNER, SR., as Administrator of the ESTATE of MELVIN TURNER, JR., Deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-02186 |
| Cook County Sheriff THOMAS DART, Individually and in his Official Capacity, COOK COUNTY, ILLINOIS, ISMAEL LEBRON (Star # 3287), DEON A. McKENZIE II (Star # 3385), BRENDAN S. NORISE (Star # 6081), RONALD CLEMONS (Star # 6035), MARK A. WOLFE (Star # 763), MARTHA N. YOKSOULIAN, SHAUNIQUE I. BURTON (Star # 18803), Correctional Sgt. E. DURAN (Star # 3214), Residential Treatment Unit Security Officer VILLAREAL, Correctional Officer KNIGHT, WILLIAM J. SHEPSKI-LINSTED, CHRISTOPHER M. SURANE, Correctional Sgt. HADDAD, Correctional FTO JONES, Correctional FTO MENDOZA, Correctional Officer NUNGARY, CODY J. CHRISTENSEN, DAVID C. KEHOE (Star # 15857), MEDICAL DIRECTOR OF CERMAK HEALTH SERVICES OF COOK COUNTY ILLINOIS, PRISCILLA WARE, Individually and as Medical Director of Cermak Health Services of Cook County, Illinois, LENA COLON, ALEXANDRIA COUTRAKON, SALVATORE MARTINEZ, ESTRELLA CLIFFORD, GEORGE A. AMBROSE, EVA COLEMAN, DAVID U. RAMOS, ALONDRA LUEVANOS, GLEN D. TRAMMELL, CHINWE UNACHUKWU, NIA SCOTT, DERRICK DUNMORE, CARLOS QUEZADA-GOMEZ, TANWA DAWODU, FAYEZ MEKHAEL NAGIB MEKHAEL, KIMBERLY L. MYERS, KINGSON U. OLIKAGU, Nurse AVILA, Nurse HESTER, TERRY L. NIL, Paramedic McCLELLAN, SUSAN BARAJAS, Nurse Manager VILLARREAL, JACKSON PARK HOSPITAL FOUNDATION d/b/a JACKSON PARK HOSPITAL AND MEDICAL CENTER, GREAT LAKES EMERGENCY PHYSICIANS MEDICAL GROUP, SC, JOE DONALD EGGEBEEN, and BRENDA KERLEY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Sara L. Ellis<br><br>Magistrate Judge Jeffrey Cole |
| Defendants. | ) ) | |

## DEFENDANT JACKSON PARK HOSPITAL FOUNDATION'S
## ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

NOW COMES the Defendant, JACKSON PARK HOSPITAL FOUNDATION d/b/a JACKSON PARK HOSPITAL AND MEDICAL CENTER ("JACKSON PARK HOSPITAL"), by and through its attorneys, CRAY HUBER HORSTMAN HEIL & VANAUSDAL LLC, and for its Answer and Affirmative Defenses to the Plaintiff's Complaint states as follows:

### NATURE OF CLAIM

1. This action arises under the United States Constitution and the laws of the United States, specifically the Civil Rights Act of 1871 (42 U.S.C. §1983), to redress deprivations of the civil rights of MELVIN TURNER, JR. through acts and/or omissions of defendants committed under color of law. Specifically, here, defendants deprived MELVIN TURNER, JR., of his rights under the Fourteenth Amendment to the United States Constitution. This action also arises under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §12131, and the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. §1395dd.

**ANSWER: This Defendant makes no answer to the allegations in Paragraph 1 that are not asserted against this Defendant. This Defendant denies the allegations in Paragraph 1 that are asserted against this Defendant.**

2. Additionally, plaintiff relies upon the Court's supplemental jurisdiction to assert the Illinois state claims of medical malpractice and indemnification.

**ANSWER: This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 2.**

### JURISDICTION AND VENUE

3. This Court has jurisdiction under and by virtue of 28 U.S.C. §§1343, 1331, and 1367.

**ANSWER: This Defendant admits that this Court has jurisdiction over this action based on the claims asserted in the Complaint and denies any remaining allegations in Paragraph 3 that are asserted against this Defendant.**

4. Venue is founded in this judicial district upon 28 U.S.C. §1391 as the acts complained of arose in this district.

**ANSWER: This Defendant admits that venue is proper before this Court based on the claims asserted in the Complaint and denies any remaining allegations in Paragraph 4 that are asserted against this Defendant.**

2

## PARTIES

5.      Plaintiff's decedent, MELVIN TURNER, JR., died at the age of 35 years old, on March 3, 2023, while incarcerated as a pretrial detainee in the Cook County Department of Corrections in Chicago, Illinois.  Prior to his death, MELVIN TURNER, JR. was a citizen of the United States and resided within the jurisdiction of this court.

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 5.**

6.      Plaintiff, MELVIN TURNER, SR., the father of MELVIN TURNER, JR., was and is now a citizen of the United States, and resides within the jurisdiction of this Court. He is filing a petition to be appointed Administrator of the ESTATE OF MELVIN TURNER, JR., with the Circuit Court of Cook County, Probate Division, and he expects to be appointed Administrator by the Probate Court soon.

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 6.**

7.      At all times herein mentioned, defendant Cook County Sheriff THOMAS DART ("DART"), was the elected Sheriff of Cook County, Illinois, and was responsible for the operations, policies, and management of the Cook County Department of Corrections, also known as the Cook County Jail, located at 2700 S. California Avenue, Chicago, Illinois, including but not limited to the hiring and training of all personnel employed by the Cook County Department of Corrections and the safety and security of all inmates detained at said facility. DART is being sued in his individual and official capacities.

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 7.**

8.      At all times herein mentioned, defendant COOK COUNTY, ILLINOIS ("COOK COUNTY") was and is a political division of the State of Illinois, existing as such under the laws of the State of Illinois. At all relevant times, COOK COUNTY owned and financed the Cook County Department of Corrections facility, also known as the Cook County Jail, and operated Cermak Health Services of Cook County (Cermak Health Services), located at 2800 S. California Avenue, Chicago, Illinois, as a subdivision of COOK COUNTY that provides medical services to detainees.

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 8.**

9.      At all times herein mentioned, defendant MEDICAL DIRECTOR OF CERMAK HEALTH SERVICES OF COOK COUNTY, ILLINOIS, who may have been PRISCILLA WARE, MD at the time relevant to this action, was an employee of COOK COUNTY and responsible for the operations, policies, and management of Cermak Health Services at the Cook County Jail. Defendant MEDICAL DIRECTOR OF CERMAK HEALTH SERVICES and

WARE are being sued individually and in their official capacity as Medical Director of Cermak Health Services of Cook County, Illinois.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 9.**

10.     At all times herein mentioned, the following defendants were each employed by Cook County Sheriff THOMAS DART and the Cook County Department of Corrections and were each acting under the color of law and in furtherance of and within the scope of their employment by defendant DART and the Cook County Department of Corrections.   These defendants are each being sued in their individual capacity:

> ISMAEL LEBRON (Star # 3287) (Sergeant)
> DEON A. McKENZIE II (Star # 3385) (Sergeant)
> BRENDAN S. NORISE (Star # 6081) (Investigator)
> RONALD CLEMONS (Star # 6035) (Investigator)
> MARK A. WOLFE (Star # 763) (Correctional Lieutenant)
> MARTHA N. YOKSOULIAN (Superintendent of Cook County Jail, Division 8, Residential Treatment Unit)
> SHAUNIQUE l. BURTON (Star # 18803) (Correctional Officer)
> Residential Treatment Unit Security Officer VILLAREAL
> Officer KNIGHT (Correctional Officer)
> WILLIAM J. SHEPSKI-LINSTED (Correctional Lieutenant)
> CHRISTOPHER M. SURANE (Correctional Sergeant)
> Sgt. E. DURAN (Star # 3214) (Correctional Officer)
> Sgt. HADDAD (Correctional Sergeant)
> FTO JONES (Correctional FTO)
> FTO MENDOZA (Correctional FTO)
> Officer NUNGARY (Correctional Officer)
> CODY J. CHRISTENSEN (Correctional Officer)
> DAVID C. KEHOE (Star #15857) (Correctional Sergeant, FTO)

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 10.**

11.     At all times mentioned herein, the following defendants were each an employee or agent of COOK COUNTY or Cermak Health Services of Cook County, and were each acting under color of law and in furtherance of and within the scope of their employment:

> LENA COLON (Emergency Response Technician)
> ALEXANDRIA COUTRAKON (Licensed Social Worker)
> SALVATORE MARTINEZ (Certified Physician's Assistant)
> ESTRELLA CLIFFORD (Registered Nurse)
> GEORGE A. AMBROSE (Emergency Response Technician)
> EVA COLEMAN (Registered Nurse)
> DAVID U. RAMOS (Correctional Medical Technician)

ALONDRA LUENVANOS (Registered Nurse)
GLEN D. TRAMMELL (Certified Physician Assistant)
CHINWE UNACHUKWU (Registered Nurse)
NIA SCOTT (Patient Information Assistant, Critical Care Unit Aide)
DERRICK DUNMORE (Mental Health Specialist)
CARLOS QUEZADA-GOMEZ (Cermak Mental Health Director, Clinical Psychologist)
TANWA DAWODU (Registered Nurse]
FAYEZ MEKHAEL NAGIB MEKHAEL (Medical Doctor)
KIMBERLY L. MYERS (Mental Health Specialist)
KINGSON U. OLIKAGU (Registered Nurse)
Nurse AVILA (Cermak Nurse)
Nurse HESTER (Cermak Nurse)
TERRY L. NIL (Paramedic)
Paramedic MCCLLELLAN (Paramedic)
SUSAN BARAJAS (Registered Nurse)
Nurse Manager VILLARREAL(Nurse Manager)

These defendants are each being sued in their individual capacity.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 11.**

12. Individuals listed in Paragraphs 10 and 11 are each liable by their direct actions and/or because of a failure to intervene in the unconstitutional acts of other government actors, despite having knowledge of those unconstitutional acts and having the opportunity to intervene to prevent those acts.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 12.**

13. Individuals listed in Paragraphs 10 and 11 who are supervisory officers are each liable by their direct actions and also as supervisors, because they approved, condoned, or turned a blind eye to the unconstitutional conduct directed at MELVIN TURNER, JR. by those they were supervising, as set forth herein.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 13.**

14. JACKSON PARK HOSPITAL FOUNDATION is an Illinois corporation doing business as JACKSON PARK HOSPITAL AND MEDICAL CENTER ("JACKSON PARK HOSPITAL").

**ANSWER:** **This Defendant admits the allegations in Paragraph 14.**

15.    GREAT LAKES EMERGENCY PHYSICIANS MEDICAL GROUP, SC ("GREAT LAKES EMERGENCY PHYSICIANS"), is a service corporation doing business in the State of Illinois.

**ANSWER:    This Defendant admits that GREAT LAKES EMERGENCY PHYSICIANS MEDICAL GROUP SC is a corporation doing business in the State of Illinois and denies any remaining allegations in Paragraph 15.**

16.    At all times mentioned herein, the following defendants, who are being sued in their individual capacity, were each an employee or agent of JACKSON PARK HOSPITAL, and/or GREAT LAKES EMERGENCY PHYSICIANS and were each acting in furtherance of and within the scope of their employment:

> JOE DONALD EGGEBEEN (Medical Doctor)
> BRENDA KERLEY (Registered Nurse)

**ANSWER:    This Defendant denies the allegations in Paragraph 16.**

## FACTUAL ALLEGATIONS

### February 12 – 28, 2023 - Arrest and Incarceration at Cook County Jail

17.    On February 12, 2023, MELVIN TURNER, JR. was arrested in the City of Chicago and charged with misdemeanor retail theft of $140.39 worth of merchandise from a downtown store, possession of .1 g suspect cocaine with a street value of $10.00, and possession of .01 g suspect heroin with a street value of $5.00. On February 22, 2023, the two drug charges were dismissed.

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 17.**

18.    MELVIN TURNER, JR. entered the Cook County Jail as a pre-trial detainee on February 12, 2023, and underwent Medical and Mental Health Intake Screening with defendants Emergency Response Technician LENA COLON and Licensed Social Worker ALEXANDRIA COUTRAKON, employees of Cook County Cermak Health Services, as required by the Cermak Health Services Policy entitled "Initial Health Assessment."

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18.**

19.    The purpose of the intake health screening process is to ensure that new detainees, who have not been convicted of any crime and are no longer free to make health care choices for themselves while in jail, receive the proper medical care.

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19.**

20.    MELVIN TURNER, JR. told defendant Medical Intake Screener COLON that he was currently homeless, that he had been using heroin for the past four years in the amount of $50.00 daily and that he had last used heroin two days earlier. MELVIN TURNER, JR. told Mental Health Intake Screener COUTRAKON "I'm withdrawing from heroin real bad" and that he was hopeful to get detox medication.

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20.**

21.    As a result of MELVIN TURNER, JR.'s intake screening, he was referred to defendant Certified Physician Assistant SALVATORE MARTINEZ for further evaluation and treatment. MARTINEZ diagnosed MELVIN TURNER, JR. as suffering from heroin withdrawal and ordered that he be placed in "Detox Housing" for five days. MARITNEZ ordered a medication cocktail historically known as "Routine A," consisting of Compazine, loperamide, and other drugs, intended to alleviate the common opioid withdrawal symptoms of pain, nausea, vomiting, diarrhea, and anxiety.

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21.**

22.    For over two decades, the policy at Cook County Jail with respect to individuals entering the Jail while suffering from opioid withdrawal had been to prescribe a Routine A type medication regimen. "Routine A helps to alleviate some of a patient's [opioid] withdrawal symptoms, but does not address all of them, nor is it a substitute for [opioid agonist] treatment." *Davis v. Carter,* 452 F.3d 686, 691 (7th Cir. 2006).

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22.**

23.    Scientific advancements in the last two decades have significantly improved the medical profession's understanding of the biology of addiction. Opioid Use Disorder ("OUD") is now known to be a serious and potentially deadly disease, the complications of which include overdose and death. These risks are particularly high upon release from incarceration, when the Routine A-like medications wear off and the excruciating opioid withdrawal symptoms and the untreated cravings for the opioid high return full force. One study found that in the first two weeks after release from jail, the risk of overdose death is 129 times higher than in the general population.

**ANSWER:    This Defendant makes no answer to the allegations in Paragraph 23, as said allegations are not asserted against this Defendant.  To the extent any of the allegations in Paragraph 23 are deemed to be asserted against this Defendant, this Defendant denies that the allegations in Paragraph 23 accurately and/or completely set forth facts and/or conclusions regarding the subject matters described and therefore denies each and every such allegation.**

24.    An opioid agonist is a drug that goes beyond simply temporarily alleviating withdrawal symptoms, which can last for weeks. An opioid agonist, such as methadone or buprenorphine, actually suppresses cravings for opioids long term and prevents users from experiencing a "high" from taking opioids. They work by binding to dopamine receptors in the brain and preventing opioids from activating them. In 2023, the gold standard for treating OUD was known in the medical profession as Medication Assisted Treatment (MAT) or Medication for Opioid Use Disorder (MOUD).

**ANSWER:    This Defendant makes no answer to the allegations in Paragraph 24, as said allegations are not asserted against this Defendant.  To the extent any of the allegations in Paragraph 24 are deemed to be asserted against this Defendant, this Defendant denies that the allegations in Paragraph 24 accurately and/or completely set forth facts and/or conclusions regarding the subject matters described and therefore denies each and every such allegation.**

25.    Methadone and buprenorphine are two MOUD medications approved by the FDA for treating OUD. Under current medical knowledge, using Routine A to alleviate only the symptoms of OUD would be like using aspirin to alleviate the pain of cancer, rather than actually treating the cancer with chemotherapy. OUD is more dangerous than ever, due to constantly evolving opioid adulterants, such as fentanyl and xylazine, which, together, can be up to 10,000 times more potent than heroin alone. Eighteen people died while incarcerated in Cook County Jail in 2023, the most deaths at the Jail since 2013, when the daily population was twice as high. At least eight of those deaths were due to drug overdose, and an additional six more were labeled death by "natural causes," when at least some of them were attributable to drug withdrawal.

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 regarding alleged deaths in the Cook County jail.  This Defendant makes no answer to the remaining allegations in Paragraph 25, as said allegations are not asserted against this Defendant.  To the extent any of the remaining allegations in Paragraph 25 are deemed to be asserted against this Defendant, this Defendant denies that the allegations in Paragraph 25 accurately and/or completely set forth facts and/or conclusions regarding the subject matters described and therefore denies each and every such allegation.**

26.    At the time that MELVIN TURNER, JR. underwent Health Intake Screening at Cook County Jail on February 12, 2023, the medical literature, the medical consensus, and even the medical standard of care were all clear that it was objectively unreasonable for defendants COLON, COUTRAKON, and MARTINEZ to continue to rely upon a decades old therapy of withdrawal management alone that did not even begin to address or treat MELVIN TURNER, JR.'s OUD with MOUD. Additionally, their treatment plan was a violation of MELVIN TURNER, JR.'s rights under the Americans with Disabilities Act (ADA).

**ANSWER:    This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26.**

8

27.     From February 12, 2023, through February 17, 2023, MELVIN TURNER, Jr.'s increasingly severe opiate withdrawal symptoms were observed by defendants LENA COLON, Registered Nurse ESTRELLA CLIFFORD, Emergency Response Technician GEORGE A. AMBROSE, Registered Nurse EVA COLEMAN, Correctional Medical Technician DAVID U. RAMOS, and Registered Nurse ALONDRA LUEVANOS. Each of these defendants knew or should have known that the medication regimen ordered by defendant MARTINEZ was becoming increasingly objectively unreasonable and inappropriate for treating MELVIN TURNER, JR.'s OUD.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 27.**

28.     On February 17, 2023, defendant Certified Physician Assistant GLEN D. TRAMMELL reviewed MELVIN TURNER, JR.'s medical chart and cleared him for discharge from Detox Housing. That same day, however, MELVIN TURNER, JR submitted a Healthcare Request Form to defendant Registered Nurse CHINWE UNACHUKWU, stating "I would like something for my anxiety & shakes for my sweats at night can't sleep Please Help! Thank you." Defendant UNACHUWU did not respond to MELVIN TURNER JR's plea for help.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 28.**

29.     On February 18, 2023, MELVIN TURNER, JR.'s Health Service Request was reviewed by defendants Registered Nurse ESTRELLA CLIFFORD, Patient Information Assistant and Critical Care Unit Aide NIA SCOTT, and Mental Health Specialist DERRICK DUNMORE, who decided there was no need for MELVIN TURNER, JR. to go to sick call or to be seen by any medical personnel. Defendants TRAMMELL, UNACHUKWU, CLIFFORD, SCOTT and DUNMORE each knew or should have known that failing to refer MELVIN TURNER, JR. to sick call where his OUD could be evaluated and treated by an actual human being was objectively unreasonable medical care.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 29.**

30.     On February 24, 2023, defendant Cermak Mental Health Director and Clinical Psychologist CARLOS QUEZADA-GOMEZ, reviewed MELVIN TURNER, JR.'s electronic health record in order to approve his release on electronic monitoring and placement in the community at a Halfway House known as Henry's Sober Living House. There is nothing in MELVIN TURNER, JR.'s medical chart to indicate that he was seen, much less treated, by any medical professional between February 18, 2023, and February 24, 2023. Defendant QUEZADA-GOMEZ's medical decision to release MELVIN TURNER, JR. from jail and into the community while he was suffering from advanced OUD and experiencing serious opioid withdrawal symptoms was objectively unreasonable medical care.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30.**

31.     Between February 24, 2023, when defendant QUEZADA-GOMEZ approved the release of MELVIN TURNER, JR. from jail, and February 28, 2023, when he was released from jail, MELVIN TURNER, JR.'s Cermak Health Services medical chart does not indicate he received any further evaluation or treatment for his OUD, again, constituting objectively unreasonable medical care. Releasing MELVIN TURNER, JR. back into the community at a time when he was experiencing horrific opioid withdrawal symptoms practically guaranteed the likelihood that he would seek relief through heavily adulterated drugs found on the street.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 31.**

32.     Furthermore, there is nothing in MELVIN TURNER, JR.'s medical chart indicating he received education on the use of Cook County Jail's readily available fentanyl test strips prior to his release from jail. This failure to educate MELVIN TURNER, JR. regarding one of the most dangerous, lethal and common opioid adulterants is further evidence of the objectively unreasonable care that he received for his OUD at Cook County Jail.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32.**

### February 28 – March 2, 2023 - Halfway House Admission

33.     On February 28, 2023, MELVIN TURNER, JR. was released from Cook County Jail on electronic monitoring (EM) and sent to Henry's Sober Living House at 8128 S. Ellis Avenue, Chicago, Illinois.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33.**

34.     On March 2, 2023, the House Manager of Henry's Sober Living House placed an emergency call to the Chicago Fire Department reporting that MELVIN TURNER, JR. was at the halfway house and was unconscious. Prior to the arrival of the paramedics, the House Manager gave MELVIN TURNER, JR. a dose of Narcan, which can reverse an opioid or fentanyl overdose, which revived him.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 34.**

### March 2, 2023 - JACKSON PARK HOSPITAL Emergency Room Visit

35.     On March 2, 2023, MELVIN TURNER, JR. was transported by Chicago Fire Department paramedics from the halfway house to JACKSON PARK HOSPITAL, 7531 S. Stony Island, Chicago, Illinois, and admitted to the Emergency Department at 4:56 p.m. by defendant Emergency Medicine Doctor JOE DONALD EGGEBEEN, for treatment of a suspected heroin overdose.

**ANSWER:** **This Defendant admits that according to the medical records, the decedent was transported from a halfway house to the emergency department at Jackson Park Hospital at that location via the Chicago Fire Department on March 2, 2023, and that Dr. Eggebeen provided certain treatment to the decedent on that date. This Defendant admits any remaining allegations in Paragraph 35 only to the extent they are consistent with the medical records and are otherwise confirmed during the discovery process, denies said allegations to the extent they are inconsistent with the medical records or are not confirmed during the discovery process, and denies any remaining allegations in Paragraph 35.**

36. Dr. EGGEBEEN is employed by the service corporation known as GREAT LAKES EMERGENCY PHYSICIANS and is also an agent of JACKSON PARK HOSPITAL.

**ANSWER:** **This Defendant denies the allegations in Paragraph 36.**

37. Upon admittance to the Emergency Department, DR. EGGEBEEN learned that his patient had recently been found in an altered mental status based on a suspected opioid overdose and that his patient presented to the Emergency Department with elevated blood pressure and tachycardia, heart and back pain, and a sweat-soaked upper body, and he demonstrated difficulty staying awake.

**ANSWER:** **This Defendant denies that the allegations in Paragraph 37 accurately reflect the complete circumstances and facts associated with the decedent's presentation to Jackson Park Hospital. This Defendant admits any remaining allegations in Paragraph 37 only to the extent they are consistent with the medical records and are otherwise confirmed during the discovery process, denies said allegations to the extent they are inconsistent with the medical records or are not confirmed during the discovery process, and denies any remaining allegations in Paragraph 37.**

38. Defendant Dr. EGGEBEEN ordered a ten-panel urine drug screen on MELVIN TURNER, JR. that came back positive for cocaine and LSD, but negative for heroin or other opioids. Based on his discharge letter to MELVIN TURNER, JR., defendant Dr. EGGEBEEN knew, or should have known, that cocaine and heroin are often adulterated with life-threatening amounts of fentanyl, which may not be detected on a ten-panel drug screen.

**ANSWER:** **This Defendant admits that Dr. Eggebeen ordered a urine drug panel with results as reflected in the medical records and denies the remaining allegations in Paragraph 38.**

39. Defendant Dr. EGGEBEEN also knew or should have known that cocaine toxicity can cause coronary vasospasm and other cardiac injuries, such as sympathomimetic toxidrome.

**ANSWER:** **This Defendant denies that the allegations in Paragraph 39 accurately and/or completely set forth facts and/or conclusions regarding cocaine toxicity and its potential effects, denies their applicability to the decedent's condition at Jackson Park Hospital, and denies any remaining allegations in Paragraph 39.**

40.     The standard of care that a reasonably careful emergency department physician would have used under the circumstances required that medications such as benzodiazepines or adjuncts such as calcium-channel blockers that would directly address cocaine toxicity be provided to MELVIN TURNER, JR.  Dr. EGGEBEEN failed to exercise that degree of care and was therefore negligent.

    <u>**ANSWER:**</u>     **This Defendant denies the allegations in Paragraph 40.**

41.     In view of possible cardiac issues with his patient, defendant Dr. EGGEBEEN appropriately ordered laboratory tests that included cardiac biomarkers. The troponin level came back negative.

    <u>**ANSWER:**</u>     **This Defendant admits that according to the medical records, Dr. Eggebeen ordered appropriate laboratory tests that included testing of cardiac enzymes with results as reflected in the medical records and denies any remaining allegations in Paragraph 41.**

42.     The standard of care that a reasonably careful emergency department physician would have used under the circumstances required that the test for troponin leakage be repeated in three hours to exclude cardiac ischemia. Defendant Dr. EGGEBEEN failed to exercise that degree of care and was therefore negligent.

    <u>**ANSWER:**</u>     **This Defendant denies the allegations in Paragraph 42.**

43.     Defendant Dr. EGGEBEEN also appropriately ordered an EKG to further investigate possible cardiac issues. The EKG report, which was interpreted by Dr. EGGEBEEN, demonstrated abnormalities, possibly related to left ventricular hypertrophy or an early repolarization variant.

    <u>**ANSWER:**</u>     **This Defendant admits that Dr. Eggebeen appropriately ordered an EKG.  This Defendant admits the remaining allegations in Paragraph 43 only to the extent they are consistent with the medical records and are otherwise confirmed during the discovery process, denies said allegations to the extent they are inconsistent with the medical records or are not confirmed during the discovery process, and denies any remaining allegations in Paragraph 43.**

44.     The standard of care that a reasonably careful emergency department physician would have used under the circumstances required that a repeat EKG be performed to exclude recent cardiac ischemia. Defendant Dr. EGGEBEEN failed to exercise that degree of care and was therefore negligent.

    <u>**ANSWER:**</u>     **This Defendant denies the allegations in Paragraph 44.**

45.     Defendant Dr. EGGEBEEN suspected that opioid abuse was the driver of his patient's altered mental status. His patient's risk for aspiration was therefore high. The standard of care that a reasonably careful emergency department physician would have used under the

circumstances required that a chest x-ray be ordered. Defendant Dr. EGGEBEEN failed to exercise that degree of care and was therefore negligent.

**ANSWER:** **This Defendant denies the allegations in Paragraph 45.**

46.    Dr. EGGEBEEN discharged his patient at 9:02 p.m. on March 2, 2023, and allowed his patient to be turned over, handcuffed, and released to the custody of Cook County Sheriff's employees, prior to completion of all testing required by the standard of care of a reasonably careful emergency department physician, as set forth above.

**ANSWER:** **This Defendant admits that the decedent was discharged from Jackson Park Hospital on March 2, 2023, as reflected in the medical records and denies the remaining allegations in Paragraph 46.**

47.    Dr. EGGEBEEN 's discharge instructions contain no discharge instructions at all. The standard of care that a reasonably careful emergency department physician would have used under the circumstances required that the immediately necessary tests be completed prior to discharge of the patient in order to rule out a possible impending cardiac emergency. In order to assure continuity of care, clear discharge instructions should have been included in the paperwork turned over to the individuals and facility to whom the patient was being released, listing all test results, as well as any necessary and uncompleted testing. Dr. EGGEBEEN failed to exercise that degree of care and was therefore negligent.

**ANSWER:** **This Defendant denies the allegations in Paragraph 47.**

48.    The Cook County Sheriff's Incident Report states that upon arrival at JACKSON PARK HOSPITAL at 8:08 p.m. on March 2, 2023, Cook County Sheriff Sgt. ISMAEL LEBRON spoke to an individual who identified herself as Head Nurse BRENDA KERLEY in the Emergency Department at JACKSON PARK HOSPITAL. Registered Nurse KERLEY directed Sgt. LEBRON to the Emergency Department bed occupied by MELVIN TURNER, JR. At 8:11 p.m., Mr. TURNER told Sgt. LEBRON that he was suffering from "heart pains" and body aches due to possible heroin withdrawal. Nurse KERLEY also informed Sgt. LEBRON that the patient had tested positive for cocaine.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 48.**

49.    Chest pains during opiate withdrawal is an important symptom of a possible major adverse cardiac event. However, there is nothing in the JACKSON PARK HOSPITAL Emergency Department medical records reporting the fact that MELVIN TURNER, JR. was complaining of chest or heart pain while at JACKSON PARK HOSPITAL. The standard of care that a reasonably careful nurse would have used under the circumstances required that such a significant symptom be reported in the Emergency Department medical chart and be acted upon. Nurse KERLEY failed to exercise that degree of care and was therefore negligent.

**ANSWER:** This Defendant admits the allegations in Paragraph 49 as to the decedent's complaints of pain only to the extent they are consistent with the medical records and are otherwise confirmed during the discovery process and denies said allegations to the extent they are inconsistent with the medical records or are not confirmed during the discovery process. This Defendant denies the remaining allegations in Paragraph 49.

50. JACKSON PARK HOSPITAL discharged its patient, MELVIN TURNER, JR., from its Emergency Room at a time when appropriate medical screening to check for an emergency medical condition had not been completed and prior to the stabilization of his emergency medical condition, including his elevated blood pressure.

**ANSWER:** This Defendant denies the allegations in Paragraph 50.

51. These institutional policies, procedures, or practices of JACKSON PARK HOSPITAL violated the Emergency Medical Treatment and Active Labor Act (EMTALA). 42 U.S.C. §1395dd. The premature discharge of MELVIN TURNER, JR. also constituted violation of the standard of care that a reasonably careful health institution would have adhered to under the circumstances and JACKSON PARK HOSPITAL was therefore negligent.

**ANSWER:** This Defendant denies the allegations in Paragraph 51.

**March 2 - 3, 2023 - Second Cook County Jail Incarceration**

52. On March 2, 2023, at 9:20 p.m., when four employees of the Cook County Sheriff's Department, defendants Sgt. ISMAEL LEBRON (Star # 3287), Sgt. DEON A. McKENZIE II (Star # 3385), Investigator BRENDAN S. NORISE (Star # 6081), and Investigator RONALD CLEMONS (Star # 6035), arrived earlier than expected at JACKSON PARK HOSPITAL, and placed MELVIN TURNER, JR. in custody, they knew he was suffering from heart pains and body aches due to a possible heroin withdrawal and that he had tested positive for cocaine.

**ANSWER:** This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 52.

53. Nevertheless, defendants LEBRON, McKENZIE, NORISE, and CLEMONS removed an ill MELVIN TURNER, JR. from JACKSON PARK HOSPITAL and transported him back to Cook County Jail.

**ANSWER:** This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 53.

54. Defendant Correctional Lieutenant MARK A. WOLFE was the supervisor of defendants LEBRON, McKENZIE, NORISE, and CLEMONS and reviewed and approved their report and actions without questioning the removal of MELVIN TURNER, JR. from JACKSON PARK HOSPITAL and his placement in custody when he was suffering from a drug overdose

and complained of "heart pains." Lieutenant WOLFE thus approved, condoned, or turned a blind eye to the conduct.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54.**

55. At 9:42 p.m., defendant MARTHA N. YOKSOULIAN, Superintendent of Cook County Jail, Division 8, Residential Treatment Unit, was notified that MELVIN TURNER, JR. was being transported from the hospital back to Cook County Jail after a drug overdose, and that custody of MELVIN TURNER, JR. had been transferred to defendant Officer KNIGHT.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 55.**

56. Defendants LEBRON, McKENZIE, NORISE, CLEMONS, YOKSOULIAN, and KNIGHT knew or should have known that the forced removal of MELVIN TURNER, JR. from JACKSON PARK HOSPITAL prior to completion of his treatment constituted unreasonable interference with his medical care, created an obligation to ensure the adequacy of continuity of care, and contributed to violation of the Americans with Disabilities Act.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56.**

57. At 11:22 p.m., defendant Registered Nurse TANWA DAWODU, performed MELVIN TURNER, JR.'s Second Intake Medical Screening in the Cermak Health Services Emergency Department, noting that he was suffering from heroin withdrawal and referring him for Medical and Mental Health Screenings.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 57.**

58. Defendant DAWODU failed to obtain and review MELVIN TURNER, JR.'s medical records from JACKSON PARK HOSPITAL, or even inquire as to any discharge instructions. This constituted objectively unreasonable continuity of care.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 58.**

59. At 11:25 p.m., as a result of MELVIN TURNER, JR.'s Second Intake Screening, defendant Medical Doctor FAYEZ MEKHAEL NAGIB MEKHAEL diagnosed him as suffering from heroin withdrawal. He did not obtain or review MELVIN TURNER, JR.'s medical records from JACKSON PARK HOSPITAL, or even inquire as to any discharge instructions. He did not pursue completion of testing for cardiac issues that was interrupted by the arrival of Cook County Sheriff's deputies at JACKSON PARK HOSPITAL, or investigate any issues that prompted MELVIN TURNER, JR.'s return to custody at the Jail after a drug overdose.

**ANSWER:** This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 59.

60. Dr. MEKHAEL ordered that MELVIN TURNER, JR. be placed in "Detox Housing" for five days. He also again ordered Routine A type medication to alleviate withdrawal symptoms of pain, nausea, vomiting, diarrhea, and anxiety during the five-day time period. Defendant Dr. MEKHAEL, however, failed to order the immediate administration of MOUD medication for MELVIN TURNER, JR.'s OUD. This constituted objectively unreasonable medical care.

**ANSWER:** This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 60.

61. At 1:11 a.m., defendant Mental Health Specialist KIMBERLY L. MYERS performed MELVIN TURNER, JR.'s Second Intake Mental Health Screening, noting that he was returning to Cook County Jail after being out on EM for a week to ten days. She further noted that MELVIN TURNER, JR. denied any drug use during that time and recommended that he be placed in General Population housing.

**ANSWER:** This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 61.

62. Defendant MYERS' failure to obtain and review MELVIN TURNER, JR.'s medical records from his First Intake Mental Health Screening and from JACKSON PARK HOSPITAL constituted objectively unreasonable continuity of care.

**ANSWER:** This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 62.

63. At 6:33 a.m., the Sheriff's Movement Log notes that MELVIN TURNER, JR. was in transit to his housing on Tier 5B in the Residential Treatment Unit ("RTU").

**ANSWER:** This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 63.

64. Correctional Officer SHAUNIQUE l. BURTON (Star # 18803), who had been assigned to monitor Tier 5B in the RTU, and who was under the supervision of defendant Sgt. E. DURAN (Star # 3214) on that date, claimed she performed her first security check of the 35 detainees housed in that tier, including MELVIN TURNER, JR., at 6:57 a.m. She also reported she had notified defendant RTU Security Officer VILLAREAL that there was no Narcan kit on the tier, necessary in the event of any potentially fatal opioid overdose of a detainee, such as MELVIN TURNER, JR., housed in the Residential Treatment Unit during her shift.

**ANSWER:** This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 64.

16

65.     Defendant BURTON claimed she performed a second security check of the detainees housed in Tier 5B at 7:30 a.m.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 65.**

66.     Defendant BURTON claimed she performed a third security check of the detainees housed in Tier 5B at 8:04 a.m.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 66.**

67.     At 8:42 a.m., defendant BURTON received a call that MELVIN TURNER, JR. was to be brought to Cermak Hospital.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 67.**

68.     At 8:48 a.m., defendant BURTON approached MELVIN TURNER, JR. and attempted to awaken him without success.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 68.**

69.     At 8:52 a.m., defendant Registered Nurse KINGSON U. OLIKAGU noted that Code Blue had been called by officers on duty and, at that time, MELVIN TURNER, JR. was stiff and rigid with bright red blood coming out of his mouth and nose.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 69.**

70.     Based on the medical fact that rigor mortis takes one to two hours to set in, the security checks provided by defendant BURTON and supervised by defendant Sgt. DURAN claiming that MELVIN TURNER, JR. was still alive were inadequate and incorrectly reported, and constituted objectively unreasonable conduct of required security for detainees housed in the RTU.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 70.**

71.     The failure of defendant RTU Security Officer VILLAREAL to ensure that a Narcan kit was immediately delivered to the RTU tier constituted objectively unreasonable conduct.

**ANSWER:     This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 71.**

72. At 8:53 a.m., after a delay of five minutes from when defendant BURTON found MELVIN TURNER, JR. unresponsive, Cardiopulmonary Resuscitation (CPR), defibrillation, and other critical life-saving measures, including the administration of epiniphrene, were first started.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 72.**

73. At 9:10 a.m., Chicago Fire Department (CFD) personnel ceased all life saving measures on MELVIN TURNER, JR., who was officially declared dead at 9:19 a.m.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 73.**

74. Between 8:48 a.m. when defendant BURTON discovered the unconscious body of MELVIN TURNER, JR. and 8:53 a.m. when CPR was first started on him, twelve correctional and medical personnel entered RTU Tier 5B, including defendants Lt. WILLIAM J. SHEPSKI-LINDSTED, Sgt. CHRISTOPHER M. SURANE, Sgt. E. DURAN, Sgt. HADDAD, FTO JONES, FTO MENDOZA, Officer NUNGARY, Correctional Officer CODY J. CHRISTENSEN, Registered Nurse OLIKAGU, Nurse AVILA, Nurse HESTER, and Sgt. FTO DAVID C. KEHOE, but no one started CPR.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 74.**

75. Also present at that approximate time were defendants Paramedic TERRY L. NIL, Paramedic McCLELLAN, Registered Nurse SUSAN BARAJAS, and Nurse Manager VILLARREAL, who also did not take all appropriate measures necessary to attempt to revive MELVIN TURNER, JR.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 75.**

76. It is likely that MELVIN TURNER, JR's sudden cardiac arrest due to ingestion of adulterated street drugs was a significant factor contributing to his death at Cook County Jail.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 76.**

77. According to the National Commission on Correctional Health Care, sudden cardiac arrest is a survivable event, dependent upon the immediacy of the response to inmate complaints. A victim's chance of surviving a cardiac arrest drops by ten percent for every minute that a normal heartbeat is not restored through use of CPR and/or use of an Automated External Defibrillator (AED). The failure of the defendants who arrived in RTU Tier 5B to timely initiate all life-saving measures decreased the likelihood that MELVIN TURNER, JR. would survive his medical emergency.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 77.**

78. Between February 12, 2023, and March 3, 2023, numerous employees of Cook County Department of Corrections and Cermak Health Services objectively unreasonably, recklessly, purposefully, and/or knowingly disregarded MELVIN TURNER's life-threatening conditions, as set forth above.

**ANSWER:** **This Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 78.**

79. By reason of the above-described acts and omissions of defendants, MELVIN TURNER, JR. sustained injuries, humiliation, and indignities; suffered great physical, mental, and emotional pain and suffering, and ultimately died, all to his and his heirs' damages in an amount to be ascertained at trial.

**ANSWER:** **This Defendant makes no answer to the allegations in Paragraph 79 that are not asserted against this Defendant. This Defendant denies the allegations in Paragraph 79 that are asserted against this Defendant.**

80. The aforementioned acts of defendants were willful, wanton, malicious, oppressive, and done with reckless indifference to and/or callous disregard for MELVIN TURNER, JR.'s rights and justify the awarding of exemplary and punitive damages in an amount to be ascertained according to proof at the time of trial.

**ANSWER:** **This Defendant makes no answer to the allegations in Paragraph 80 that are not asserted against this Defendant. This Defendant denies the allegations in Paragraph 80 that are asserted against this Defendant.**

81. By reason of the above-described acts and omissions of defendants, plaintiff was required to retain an attorney to institute, prosecute, and render legal assistance to him in the within action so that he might vindicate the loss and impairment of MELVIN TURNER, JR.'s rights. By reason thereof, plaintiff requests payment by defendants, and each of them, of a reasonable sum for attorney's fees pursuant to 42 U.S.C. §1988, the Equal Access to Justice Act, or any other provision set by law.

**ANSWER:** **This Defendant makes no answer to the allegations in Paragraph 81 that are not asserted against this Defendant. This Defendant denies the allegations in Paragraph 81 that are asserted against this Defendant.**

## COUNT I

**VIOLATION OF MELVIN TURNER, JR.'S FOURTEENTH AMENDMENT RIGHTS BY DEFENDANTS' OBJECTIVELY UNREASONABLE ACTION IN RESPONDING TO HIS SERIOUS MEDICAL NEEDS**

This Defendant makes no answer to the allegations in Count I, as said allegations are not asserted against this Defendant. To the extent any of the allegations in Count I are deemed to be asserted against this Defendant, this Defendant denies each and every such allegation.

## COUNT II

**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA) BY DEFENDANTS Cook County Sheriff THOMAS DART, COOK COUNTY, ILLINOIS, the MEDICAL DIRECTOR OF CERMAK HEALTH SERVICES, and PRISCILLA WARE, as Medical Director of Cermak Health Services**

This Defendant makes no answer to the allegations in Count II, as said allegations are not asserted against this Defendant. To the extent any of the allegations in Count II are deemed to be asserted against this Defendant, this Defendant denies each and every such allegation.

## COUNT III

**_MONELL_ CLAIM AGAINST COOK COUNTY SHERIFF DART**

This Defendant makes no answer to the allegations in Count III, as said allegations are not asserted against this Defendant. To the extent any of the allegations in Count III are deemed to be asserted against this Defendant, this Defendant denies each and every such allegation.

## COUNT IV

**_MONELL_ CLAIM AGAINST defendants COOK COUNTY, MEDICAL DIRECTOR OF CERMAK HEALTH SERVICES, and PRISCILLA WARE as Medical Director of Cermak Health Services**

This Defendant makes no answer to the allegations in Count IV, as said allegations are not asserted against this Defendant. To the extent any of the allegations in Count IV are deemed to be asserted against this Defendant, this Defendant denies each and every such allegation.

## COUNT V

## MEDICAL MALPRATICE AGAINST DEFENDANTS JACKSON PARK HOSPITAL, GREAT LAKES EMERGENCY PHYSICIANS, JOE DONALD EGGEBEEN, MD, AND BRENDA KERLEY

107.    Plaintiff, MELVIN TURNER, SR., as Administrator of the ESTATE of MELVIN TURNER, JR., Deceased, incorporates and alleges all factual allegations in paragraphs 1-81, as though set forth herein in their entirety.

**ANSWER:    This Defendant restates its answers to Paragraphs 1 through 81 as its answers to Paragraphs 1 through 81 of Count V as though fully set forth herein.**

108.    MELVIN TURNER, JR. was treated and evaluated at JACKSON PARK HOSPITAL Emergency Room in Chicago, Illinois, on March 2, 2023, by Dr. JOE DONALD EGGEBEEN and Registered Nurse BRENDA KERLEY, after a suspected opioid overdose at the halfway house where he had been residing after his earlier release from the Cook County Jail.

**ANSWER:    This Defendant admits the allegations in Paragraph 108 only to the extent they are consistent with the medical records and are otherwise confirmed during the discovery process, denies said allegations to the extent they are inconsistent with the medical records or are not confirmed during the discovery process, and denies any remaining allegations in Paragraph 108.**

109.    Dr. JOE DONALD EGGEBEEN is a JACKSON PARK HOSPTIAL Emergency Department Physician. He is employed by either JACKSON PARK HOSPITAL or by a service corporation known as GREAT LAKES EMERGENCY PHYSICIANS MEDICAL GROUP, SC. He was at all relevant times also an agent of JACKSON PARK HOSPITAL.

**ANSWER:    This Defendant denies the allegations in Paragraph 109.**

110.    Registered Nurse BRENDA KERLEY was at all relevant times an employee or agent of JACKSON PARK HOSPITAL.

**ANSWER:    This Defendant denies the allegations in Paragraph 110.**

111.    At all relevant times, JACKSON PARK HOSPITAL, GREAT LAKES EMERGENCY PHYSICIANS MEDICAL GROUP, SC, Dr. JOE DONALD EGGEBEEN, and Nurse BRENDA KERLEY, as healthcare providers, owed a duty to maintain adequate treatment policies and a duty to review and supervise the care of their patients, including MELVIN TURNER, JR.

**ANSWER:    This Defendant denies that the allegations in Paragraph 111 accurately set forth any duty owed to the decedent and therefore denies the allegations in Paragraph 111.**

112.     Despite this duty, JACKSON PARK HOSPITAL, GREAT LAKES EMERGENCY PHYSICIANS MEDICAL GROUP, SC, Dr. JOE DONALD EGGEBEEN, and Nurse BRENDA KERLEY, failed to exercise the care that a reasonably careful healthcare institution, physician, and/or nurse would have under the circumstances, and they were therefore negligent in their care of MELVIN TURNER, JR.

**ANSWER:**     **This Defendant denies the allegations in Paragraph 112.**

113.     As set forth more fully above, the failure of the aforesaid healthcare providers to perform a repeat EKG, a repeat test for troponin, a more detailed test for fentanyl, and a chest x-ray, and to refuse to discharge their patient at a time when his evaluation and treatment were incomplete, or to provide adequate written discharge instructions at the time of transfer of MELVIN TURNER, JR.'s medical care to Cook County Jail violated the standard of care that reasonably careful healthcare providers would have used under the circumstances and were therefore negligent.

**ANSWER:**     **This Defendant denies the allegations in Paragraph 113.**

114.     As a direct and proximate result of the negligent acts and omissions of JACKSON PARK HOSPITAL, GREAT LAKES EMERGENCY PHYSICIANS MEDICAL GROUP, SC, Dr. JOE DONALD EGGEBEEN, and Nurse BRENDA KERLEY, MELVIN TURNER, JR. suffered unnecessary mental distress and physical pain, and ultimately death.

**ANSWER:**     **This Defendant denies the allegations in Paragraph 114.**

115.     As required by the Illinois Healing Art Malpractice statute, 735 ILCS 5/2-622, plaintiff has attached the requisite affidavit and confidential consulting report to this Complaint.

**ANSWER:**     **This Defendant admits that an affidavit of the Plaintiff's attorney and purported physician's report are attached to the Complaint and denies any remaining allegations in Paragraph 115.**

WHEREFORE, the Defendant, JACKSON PARK HOSPITAL FOUNDATION d/b/a JACKSON PARK HOSPITAL AND MEDICAL CENTER, denies that the Plaintiff, MELVIN TURNER, SR., as Administrator of the ESTATE of MELVIN TURNER, JR., Deceased, is entitled to recovery in any amount whatsoever from this Defendant and requests that this Court enter an Order dismissing the Plaintiff's cause of action and Complaint as against this Defendant with prejudice and with an award of reasonable attorney's fees and costs.

## COUNT VI

### VIOLATION OF THE EMERGENCY MEDICAL TREATMENT ACT

116.     JACKSON PARK HOSPITAL discharged its patient, MELVIN TURNER, JR., from its Emergency Room at a time when appropriate medical screening to check for an emergency medical condition had not been completed and prior to the stabilization of his emergency medical condition, including his elevated blood pressure and potential for a fatal drug overdose.

**ANSWER:     This Defendant denies the allegations in Paragraph 116.**

117.     The institutional policies, procedures, or practices used violated the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. §1395dd. The premature discharge of MELVIN TURNER, JR. also constituted violation of the standard of care that a reasonably careful health institution would have adhered to under the circumstances and JACKSON PARK HOSPITAL was therefore negligent.

**ANSWER:     This Defendant denies the allegations in Paragraph 117.**

118.     As a direct and proximate result of the negligent acts and omissions of JACKSON PARK HOSPITAL, MELVIN TURNER, JR. suffered unnecessary mental distress and physical pain, and ultimately death.

**ANSWER:     This Defendant denies the allegations in Paragraph 118.**

WHEREFORE, the Defendant, JACKSON PARK HOSPITAL FOUNDATION d/b/a JACKSON PARK HOSPITAL AND MEDICAL CENTER, denies that the Plaintiff, MELVIN TURNER, SR., as Administrator of the ESTATE of MELVIN TURNER, JR., Deceased, is entitled to recovery in any amount whatsoever from this Defendant and requests that this Court enter an Order dismissing the Plaintiff's cause of action and Complaint as against this Defendant with prejudice and with an award of reasonable attorney's fees and costs.

## COUNT VII

### INDEMNIFICATION OF DEFENDANTS BY DEFENDANT DART, IN HIS OFFICIAL CAPACITY (735 ILCS 10/9-102)

This Defendant makes no answer to the allegations in Count VII, as said allegations are not asserted against this Defendant.  To the extent any of the allegations in Count VII are deemed to be asserted against this Defendant, this Defendant denies each and every such allegation.

23

## COUNT VIII

### INDEMNIFICATION OF DEFENDANTS BY DEFENDANT COOK COUNTY
**(735 ILCS 10/9-102 and 55 ILCS 5/5-1002)**

This Defendant makes no answer to the allegations in Count VIII, as said allegations are not asserted against this Defendant. To the extent any of the allegations in Count VIII are deemed to be asserted against this Defendant, this Defendant denies each and every such allegation.

### FIRST AFFIRMATIVE DEFENSE
**(Contributory Negligence)**

1.     The Plaintiff, MELVIN TURNER, SR., seeks recovery against this Defendant for claimed injuries and/or damages allegedly arising from the care and treatment rendered to MELVIN TURNER, JR. ("the decedent") at Jackson Park Hospital on March 2, 2023.

2.     On March 2, 2023, and at all times relevant to this action, the decedent had a duty to exercise ordinary and reasonable care, including, but not limited to, acting in a reasonable manner in furtherance of his own health, safety, and well-being, and reasonably participating in his care and treatment.

3.     The decedent breached this duty in one or more of the following ways:

    a.     Consumed illegal drugs and/or illegal controlled substances;

    b.     Consumed drugs, medications, and/or substances that were not ordered or prescribed by a physician or an authorized healthcare provider;

    c.     Failed to provide accurate and/or complete information regarding his history of drug use, complaints, and/or symptoms to his healthcare providers, including his healthcare providers at Jackson Park Hospital; and

    d.     Was otherwise careless and negligent in taking reasonable care for his own health, safety, and well-being.

4.     One or more of the aforementioned negligent acts and/or omissions by the decedent caused or contributed to cause the injuries and/or damages claimed by the Plaintiff,

including the decedent's death.

5.      The Plaintiff is barred from recovery pursuant to 735 ILCS 5/2-1116, as the decedent's contributory fault exceeds 50% of the proximate cause of alleged injury or damage for which recovery is sought.  Alternatively, to the extent the decedent's contributory fault is less than 50% of the proximate cause of the alleged injury or damage for which recovery is sought, any or all damages allowed should be diminished by the proportion of fault which is attributable to the decedent.

WHEREFORE, the Plaintiff should be barred from recovering damages in any amount whatsoever from this Defendant, or alternatively, any such recovery should be reduced commensurate with the percentage of contributory fault attributable to the decedent.

<u>SECOND AFFIRMATIVE DEFENSE</u>
**(Assumption of Risk)**

1.      The Plaintiff, MELVIN TURNER, SR., seeks recovery against this Defendant for claimed injuries and/or damages allegedly arising from the care and treatment rendered to MELVIN TURNER, JR. ("the decedent") at Jackson Park Hospital on March 2, 2023.

2.      On March 2, 2023, and at all other times relevant to this action, the decedent knew or should have known that his consumption of illegal drugs, illegal controlled substances, drugs, medications, and/or substances that were not ordered or prescribed by a physician or an authorized healthcare provider were dangerous activities subjecting him to the risk of injury and/or death.

3.      On March 2, 2023, and at all other times relevant to this action, the decedent knew or should have known that his failure to provide accurate and/or complete information regarding his history of drug use, complaints, and/or symptoms to his healthcare providers,

including his healthcare providers at Jackson Park Hospital, subjected him to the risk of injury and/or death.

4.       On March 2, 2023, and at all other times relevant to this action, the decedent assumed the risk of consuming illegal drugs, illegal controlled substances, drugs, medications, and/or substances that were not ordered or prescribed by a physician or an authorized healthcare provider.

5.       On March 2, 2023, and at all other times relevant to this action, the decedent assumed the risk of his failure to provide accurate and/or complete information regarding his history of drug use, complaints, and/or symptoms to his healthcare providers, including his healthcare providers at Jackson Park Hospital.

6.       The decedent's assumption of these risks contributed to and/or was the sole proximate cause of his alleged injuries and/or death.

7.       The Plaintiff's alleged claim for recovery against this Defendant should be barred as a result of the decedent's assumption of these risks.

WHEREFORE, the Plaintiff should be barred from recovering damages in any amount whatsoever from this Defendant.

Respectfully submitted,

CRAY HUBER HORSTMAN HEIL &
VANAUSDAL LLC

By: _____ */s/ Shannon E. Holbrook*_____
        One of the Attorneys for the Defendant,
        JACKSON PARK HOSPITAL FOUNDATION

Shannon E. Holbrook
CRAY HUBER HORSTMAN HEIL & VANAUSDAL LLC
303 W. Madison Street, Suite 2200
Chicago, Illinois  60606
Phone:   (312) 332-8450
E-mail:   seh@crayhuber.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 19, 2025, a copy of the following document was filed electronically:

- **Defendant Jackson Park Hospital Foundation's Answer and Affirmative Defenses to Plaintiff's Complaint.**

Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Shannon E. Holbrook*

Shannon E. Holbrook
CRAY HUBER HORSTMAN HEIL &
VANAUSDAL LLC
303 W. Madison Street, Suite 2200
Chicago, Illinois 60606
(312) 332-8450
seh@crayhuber.com
*Attorneys for Defendant, Jackson Park Hospital Foundation*